IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JESSICA M. NITSCH,<br><br>                    Plaintiff,<br><br>          vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                    Defendant. | **8:13CV95**<br><br>**MEMORANDUM AND ORDER ON REVIEW OF THE FINAL DECISION OF THE COMMISSIONER OF SOCIAL SECURITY** |

Jessica M. Nitsch filed a complaint on March 20, 2013, against the Commissioner of the Social Security Administration. (ECF No. 1.) Nitsch seeks a review of the Commissioner's decision to deny her application for disability insurance benefits under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., 1381 et seq. The defendant has responded to the plaintiff's complaint by filing an answer and a transcript of the administrative record. (See ECF Nos. 11, 12.) In addition, pursuant to my order, dated May 28, 2013, (ECF No. 14), each of the parties has submitted briefs in support of her position. (See generally Pl.'s Br., ECF No. 15; Def.'s Br., ECF No. 25, Pl.'s Reply Br., ECF No. 26). After carefully reviewing these materials, I find that the Commissioner's decision must be affirmed.

## I.   BACKGROUND

Nitsch applied for disability insurance benefits in 2004, but she was denied. (See ECF No. 12, Transcript of Social Security Proceedings (hereinafter "Tr.") at 49, 51). She applied a second time on September 25, 2009, seeking benefits under Title II of the Act. (Id. at 155-61). She also filed an application for supplemental security income (SSI) benefits under Title XVI. (Id. at 162-65). In both

applications, Nitsch alleged an onset date of March 21, 2003. (Id. at 155, 162). Nitsch later amended the onset date to April 24, 2008. (Id. at 13). After her application was denied initially and on reconsideration, (id. at 93-96, 98-101, 104-107, 108-111). Nitsch requested a hearing before an administrative law judge (hereinafter "ALJ").  (Id. at 114). This hearing was conducted on August 16, 2011. (Id. at 47-86). In a decision dated September 12, 2011, the ALJ concluded that Nitsch was not entitled to disability insurance benefits. (Id. at 10-31). The Appeals Council of the Social Security Administration denied Nitsch's request for review. (Id. at 1-6.) Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Nitsch seeks judicial review.

## II.    SUMMARY OF THE RECORD

Nitsch, who was born August 6, 1964, (id. at 183) has a bachelor's degree, was single, and had no children. (Id. at 55-56, 196). Her previous application for disability was denied after a hearing on June 6, 2007. (Id. at 184). Nitsch stated that her conditions included depression, asthma, sinusitis, chronic fatigue syndrome (CFS), narcolepsy, attention deficit disorder (ADD), repetitive motion injuries to her right wrist and elbow, and migraine headaches. (Id. at 187). Nitsch had lived with her parents since returning to Omaha from Minneapolis in 2001. (Id. at 60). Her last paid employment had been for PayPal in 2003. (Id. at 235). Nitsch alleged that because of CFS and chronic sinus infections she is either too tired or too sick or both to leave the house. (Id. at 240).

### A. Medical Evidence

Nitsch alleged that her medical problems began in 1997 when she was hospitalized with pneumonia in Minneapolis. (Id. at 339). She alleged that she was

diagnosed with CFS in 2000.[1] (Id. at 339). In December 2007, Nitsch was diagnosed with severe idiopathic hypersomnolence, for which she was prescribed medication. (Id. at 311-12). In October 2008, George Thommi, M.D., noted that Nitsch's asthma appeared to be well-controlled on medication. (Id. at 313). Nitsch had sinus surgery in March 2009. (Id. at 367, 388).

Nitsch also was treated by James V. Ortman, M.D. On April 1, 2008, Nitsch reported that she had no energy and that she had worked only about 18 months in the past 12 years because of recurrent bronchitis/sinusitis and CFS. (Id. at 339). On September 10, 2008, Ortman noted that Nitsch remained disabled by her physical complaints. Her main problem was CFS, which required her to plan simple daily activities, such as showering. (Id.). Ortman noted that Nitsch had been diagnosed in the past with cyclothymia and ADD and that she had a family history of depression. Ortman believed that Nitsch could benefit from cognitive behavior therapy and a graded exercise program, but she was concerned as to whether her health insurance would cover the therapy. Ortman wrote, "She is also considering another try at disability which I would have to support in view of the overall clinical condition." (Id. at 338).

Nitsch reported on March 2, 2010, that she continued to lack energy and had been homebound during the winter. (Id. at 506). She said she had no energy to exercise. Ortman stated, "I believe she deserves disability with all of these problems, particularly the narcolepsy and chronic fatigue syndrome." (Id.). Ortman stated in May 2010 that Nitsch fulfilled the criteria for a diagnosis of CFS. (Id. at 590).

Nitsch was also treated for migraine headaches. In August 2008, she was

---

[1] Although Nitsch alleged that she was diagnosed with CFS in 2000, it is not

seen by Robert R. Sundell, M.D., (Id. at 305) when she reported that the medications she had been prescribed four years earlier were no longer helping. Nitsch stated that she had up to eight migraines each month, which interfered with her functioning. Her neurological examination was normal, and she was prescribed Topamax. (Id.).

Nitsch took part in therapy with Rosanna Jones-Thurman, Ph.D., between October 2008 and September 2012. Handwritten therapy progress notes from Jones-Thurman reflect that when therapy started, Nitsch reported that she lived in the basement of her parents' home, that the situation was fairly unbearable, that her mother made her feel guilty, and that her mother blamed Nitsch for everyone's unhappiness. (Id. at 568). Nitsch demonstrated a great deal of anger toward her self and others and misdirected it. Jones-Thurman commented that Nitsch cried, threw things, yelled at others, and did not accept responsibility. (Id.). Jones-Thurman noted that Nitsch had problems with self-esteem and a lot of issues related to emotional loss, grief, and abandonment. (Id. at 567). After Nitsch reported in November 2008 that conditions at home continued to be bad, Jones-Thurman stated that Nitsch needed to apply for disability to try to get out of the home. (Id. at 566).

Nitsch also reported on difficulties she had with her financial situation. In September 2009, she received notice that her funds were being garnished. (Id. at 551). She had stopped paying bills rather than file for bankruptcy. She was upset with having to be dependent on her mother. (Id.). Later the same month, she stated that she was going to talk to her brother's bankruptcy attorney. (Id. at 550). In October 2009, Nitsch reported that she had avoided or ignored a stack of bills and

_____

mentioned in the decision denying disability made in 2004.

other papers that included collection notices because her mother had not paid Nitsch's bills. (Id. at 548). In November 2009, Nitsch reported that she felt overwhelmed by paperwork and things she needed to do. She was not feeling supported by her mother who wanted Nitsch to be less financially dependent. (Id. at 546). In December 2009, Nitsch continued to feel financial pressure from her parents, but her mother gave her some cash for Christmas shopping. (Id. at 545).

In February 2010, Nitsch reported that she had received a notice from a credit card company and was hoping she could keep her car. She had been arguing with her mother a lot about finances because her mother wanted Nitsch to file for bankruptcy or sell some stock. (Id. at 541).

Throughout therapy, Nitsch related her activities and social functioning. She reported that she babysat her niece on a regular basis, and took part in activities with her, including going to her soccer and softball games, walking her to and from swim lessons, watching DVDs, baking cookies, going to the zoo, and going to see the "Nutcracker." (Id. at 567, 563, 555, 554, 545). She also cared for her niece for several days at a time and hosted a sleepover for her. (Id. at 628). In the summer of 2009, Nitsch acted as a nanny for her niece. (Id. at 553).

At various times during therapy, Nitsch reported that she swam a few laps at the pool, and went to friends' homes, to visit friends in Minneapolis, to family get-togethers, out to lunch with visiting family, to the farmer's market, to a Nebraska football game, to a movie, to church, and to Morrill Hall in Lincoln with a neighbor. (Id. at 562, 554, 543, 537, 601, 630, 627, 625).  In August 2009, Nitsch reported she had gone to Minneapolis to visit friends, but she had some depression after she returned because she missed Minnesota and her friends and dwelled on the life she could have had. (Id. at 552). In March 2011, Nitsch reported that she drove her mother to a funeral in North Platte. (Id. at 627). She said it went pretty

well, but they both experienced anxiety from the weather. (Id.).

For Easter 2011, Nitsch reported that she cleaned the basement area where she lived for an Easter gathering, but she was so exhausted from the preparation that she did not go upstairs to visit with family. Instead, she sat alone in the basement and no one came down to visit her. (Id. at 625). In May 2011, Nitsch reported that she spent three hours at a spa where she had a makeover. (Id. at 669). She went to Lake Okoboji for five days in October 2012. (Id. at 710).

Jones-Thurman noted that Nitsch appeared to have hoarding issues. She reported working to clean out a storage unit and closets, but she had difficulty parting with things. (Id. at 540). Nitsch later told Jones-Thurman that she had been selling items on eBay and was spending time looking into making jewelry to sell on the internet. (Id. at 600). She had a garage sale and at one time was working on creating an Etsy website. (Id. at 667).

In May 2010, Nitsch reported that she was upset by her mother's statements that Nitsch was seeing Jones-Thurman in order to get disability and that her mother believed that it was Jones-Thurman's responsibility to qualify Nitsch for disability. (Id. at 537).

Jones-Thurman completed three psychological evaluations of Nitsch. In October 2008, Jones-Thurman noted that Nitsch reported she had been diagnosed in Texas with CFS, but doctors in Omaha had told her they were not sure she had the illness. (Id. at 571). Jones-Thurman noted that Nitsch looked depressed and apathetic. She reported that she would like to be more social, but she thought that would involve spending money to eat out. She had depression and anxiety from a lack of money. (Id. at 572). Nitsch reported that she had problems with attention, concentration, and distraction. (Id.). Jones-Thurman stated that Nitsch appeared to be of average intellectual ability, but was demonstrating a mood disturbance. Her

affect was appropriate to her mood, which was flat and depressed. (Id. at 573). Jones-Thurman encouraged Nitsch to reapply for disability. (Id. at 574). Nitsch had compulsive issues with buying items and running up debt, but it appeared some of it was related to socializing and wanting to live a lifestyle that she was unable to because of her lack of income. She did not meet the criteria for cyclothymia. (Id.). Nitsch most likely had dysthymic disorder and a possible depressive disorder, NOS, as well as adjustment issues from her situation, and ADHD, inattentive type. Jones-Thurman stated that it did not appear that Nitsch could hold a full-time job and have reasonable employment. She was very slow in moving and quite obese. Her irritability, depression, and anxiety would interfere with not only work-related duties, but in getting along with others. (Id.).

Jones-Thurman stated that Nitsch had dysthymic disorder; ADHD, inattentive type, moderate; and adjustment disorder, with depression and anxiety; and personality disorder, NOS (not otherwise specified). Her physical conditions included obesity, CFS, narcolepsy, sinusitis, allergies, asthma, migraines, and repetitive motion injury. Her current GAF was 49.[2] (Id. at 574).

Jones-Thurman submitted a psychological report after evaluating Nitsch on December 7, 2009. (Id. at 429). Jones-Thurman stated that Nitsch's ability to receive, organize, analyze, remember, and express information appropriately in a conversational setting was within the average range. Her mood and affect were flat and depressed. Her attention and concentration were intact as measured by her

---

[2] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

ability to respond to questions. She was able to demonstrate ability to do abstract reasoning by solving similarities and differences. (Id. at 433). Nitsch stated that she had no restrictions on activities of daily living due to mental health problems, but she was not very active because of physical problems. (Id.). Although she was able to sustain attention and concentration for task completion if it was short and simple, she also got distracted and procrastinated. (Id. at 434). Jones-Thurman's diagnostic impressions were generally the same as the 2008 evaluation. (Id. at 435). Her current GAF was 50. (Id.).

Jones-Thurman stated that Nitsch's prognosis was guarded. She had significant anxiety and depression and felt that her situation was fairly hopeless and helpless. She reported some fears and phobias and appeared to be somewhat obsessive-compulsive in nature, although it was not clear she met the criteria for actual diagnoses in those areas. It was recommended that she continue with therapy and medications. Jones-Thurman stated that although Nitsch had the mathematical ability to manage funds on her own behalf, she had compulsive spending problems which had gotten her into debt. She had outstanding student loans and thousands of dollars of credit card debt. (Id. at 435). Despite her mother putting her on a monthly allowance, she continued to overspend on a regular basis. (Id. at 436). Jones-Thurman indicated that Nitsch had no restriction in activities of daily living or in maintaining social functioning, but she had difficulty in adapting to changes in her environment. (Id. at 437).

Jones-Thurman completed a medical statement of ability to do work-related activities on December 2, 2009, when she had been providing therapy for more than one year. (Id. at 407-08). She stated that Nitsch had good ability to follow work rules, relate to co-workers, deal with the public, use judgment, function independently, understand, remember and carry out simple job instructions,

maintain personal appearance, and behave in an emotionally stable manner. Nitsch had a fair ability to interact with supervisors, deal with work stresses, maintain attention and concentration, understand, remember and carry complex or detailed instructions, and relate predictably in social situations. (Id. at 407). Jones-Thurman stated that Nitsch had average intelligence and had spent more than one year "with the goal of applying for disability." (Id. at 408).

In June 2010, Jones-Thurman completed a psychological evaluation form for affective disorders. (Id. at 582-89). Nitsch exhibited the following symptoms related to a depressive syndrome: appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt and/or worthlessness, and difficulty concentrating or thinking. She had exhibited the following symptoms related to a manic syndrome: hyperactivity, inflated self-esteem, and easy distractibility. (Id. at 584). She had not demonstrated any symptoms of bipolar syndrome. Jones-Thurman noted that Nitsch had exhibited marked difficulties in paying bills, planning daily activities, cooking, cleaning, and initiating and participating in activities independent of supervision and direction. (Id. at 585). She showed moderate impairment in grooming and hygiene. She could not plan or organize and she could not manage money. It took her more than one year to complete her disability application. (Id.).

Jones-Thurman stated that Nitsch had exhibited marked difficulties in the following areas of social functioning: getting along with family and friends, exhibiting social maturity, responding to supervision and to those in authority, and holding a job. (Id. at 586). Jones-Thurman stated that Nitsch was somewhat immature, easily annoyed and irritated, and probably did not respond well to criticism or any form of constructive feedback. Nitsch had a slow pace, had obsessive compulsive disorder to such a degree that she could not get things done,

9

had no persistence, and had poor attention and concentration. (Id.). She exhibited marked impairment in the ability to complete tasks in a timely manner, to repeat sequences of actions to achieve a goal, to assume increased mental demands associated with competitive work, and to sustain tasks without an unreasonable number of breaks or rest periods and without undue interruptions or distractions. (Id. at 587).

Jones-Thurman stated that Nitsch had displayed withdrawal from situations, exacerbation of signs and symptoms of illness, deterioration from level of functioning, decompensation, poor attendance, inability to cope with schedules and to adapt to changing demands, and poor decision-making. (Id.). Jones-Thurman stated that Nitsch had a medically documented history of a chronic affective disorder of at least two years' duration that had caused more than a minimal limitation of ability to do basic work activities. (Id. at 588). Jones-Thurman stated that Nitsch's mental condition would remain at the severity level indefinitely because Nitsch has done medical management and therapy since high school. (Id. at 589).

In November 16, 2010, Jones-Thurman stated that Nitsch's condition remained the same since her June 2010 opinion. (Id. at 606). Ortman also stated that Nitsch's condition remained the same. (Id. at 609). Both Ortman and Jones-Thurman stated that her condition remained the same in May 2011 (Id. at 639, 641) and in December 2012. (Id. at 705, 716).

## B. Medical Opinion Evidence

Nitsch's treating physicians and state disability experts provided medical opinions about Nitsch's conditions and abilities. In a medical source statement, Ortman indicated that Nitsch could sit for two hours, followed by walking around, stand or walk for 15 minutes, (id. at 591) and sit for five hours in an eight-hour

day. (Id. at 592-93). After standing or walking around for the maximum period, it was sufficient for her to sit in a working position at a desk or table. (Id. at 593). Her total cumulative standing or walking around during an eight-hour day was less than one hour. (Id. at 594). The total cumulative resting time Nitsch needed during an eight-hour day was two hours. (Id. at 594-95). Ortman stated that Nitsch could occasionally lift one to five pounds and could occasionally balance and stoop. (Id. at 595-96). Ortman stated that Nitsch could occasionally experience enough pain or other symptoms that interfere with attention and concentration to perform even simple work tasks. (Id. at 596). Nitsch was likely to be absent from work more than four days per month. (Id.).

Jeremy Toomey, M.D., completed a consultative examination report on December 6, 2009. (Id. at 410). Nitsch told Toomey she never fully recovered from pneumonia in 1997. She said  she was hospitalized for three days, but Toomey noted that she was not on ventilator support and not in the intensive care unit. Nitsch said she had to quit her job as a financial advisor for American Express and moved back to Omaha because she was unable to perform her duties. (Id.). Nitsch stated that narcolepsy contributes to her CFS because she cannot count on getting a good night's sleep. (Id. at 411). Nitsch reported that she had not worked since 2003. She would like to work, but she had not recently tried to find work because she was not sure what she would be able to do. (Id. at 414). Toomey stated that Nitsch's CFS had a major impact on basic activities of daily living and her ability to hold a job. (Id. at 419). Although medication had been helpful in controlling her medical problems, Nitsch was still unable to muster the energy to complete basic activities of daily living. (Id.).

On December 20, 2009, Glenda L. Cottam, Ph.D., completed a mental residual functional capacity (RFC) assessment. (Id. at 461-463). Cottam found that

Nitsch had no significant limitations in understanding and memory of either short and simple or detailed instructions. (Id. at 461). Nitsch had no significant limitations in the ability to carry out short and simple or detailed instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 461-62). Nitsch had no significant limitations in the ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Id. at 462). Nitsch had moderate limitations in the ability to maintain attention and concentration for extended periods and in the ability to accept instructions and respond appropriately to criticism from supervisors. (Id. at 461-62). She had no significant limitations in the ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. There was no evidence of limitations in the ability to be aware of normal hazards and take appropriate precautions or the ability to travel in unfamiliar places or use public transportation. (Id. at 462).

On a psychiatric review technique, Cottam stated that Nitsch had no restriction in activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Id. at 466-476). Cottam concluded that there was no evidence of a substance

abuse disorder and that Nitsch may have some mild or possibly moderate challenges related to her mental health condition. She could drive, read, and be on the computer for hours, so there did not appear to be any marked problems with attention. (Id. at 478).

A physical RFC was completed by Glenn Knosp, M.D., on January 15, 2010. (Id. at 483-493). Knosp determined that Nitsch could frequently lift and/or carry 10 pounds. (Id. at 484). She could stand and/or walk at least two hours in an eight-hour workday, and she could sit about six hours in an eight-hour workday. She was unlimited in her ability to push and/or pull. (Id.). Nitsch could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id. at 485). She had no manipulative, visual, or communicative limitations. (Id. at 486-87). Nitsch had no limitations as to wetness, humidity, or noise, but she should avoid concentrated exposure to extreme cold or heat, vibration, fumes and odors, and hazards. (Id. at 487). Knosp found that Nitsch had full range of motion in all joints and a normal gait. (Id. at 492). He stated that Nitsch's allegations were not fully credible. Her primary problem was obesity, and although she had a history of narcolepsy, it was well-controlled. Nitsch complained of CFS related directly to obesity. (Id. at 492). There was no evidence to support limitations in the use of her upper extremities. Knosp found that Nitsch did not meet or equal any listing and that she appeared capable of work as outlined in the RFC. (Id. at 493).

Patricia Newman, Ph.D., completed a psychiatric review technique on April 8, 2010. (Id. at 529-530). She affirmed the mental RFC of December 20, 2009. (Id. at 529). Newman noted that the updated records did not show any significant changes that would alter the prior mental RFC. (Id. at 530).

Jerry Reed, M.D., completed a physical RFC on April 8, 2010. (Id. at 531). He affirmed the previous RFC and noted that Nitsch had been seen by her primary

care provider on March 2, 2010, but the records did not contain any objective findings. Nitsch still apparently had CFS. (Id.).

## C. Hearing Testimony

At a hearing on August 16, 2011, the ALJ noted that Nitsch had a driver's license and a car. (Id. at 60). Her mother gave her $1,000 per month, and in return, she helped out around the house when she was able and helped take care of her niece, who was 9 years old. (Id.). Nitsch said she has two dogs, which she fed and tried to take on walks when she was able, but the house had a doggie door, so they could take care of themselves. (Id. at 61-62). When she walked, she could sometimes walk a couple of blocks and other times she could walk for one mile. (Id. at 62). Nitsch said there had been no change in her condition since she applied for disability in 2004. She said her health issues kept her from being a consistent and reliable employee. She might be able to work a few hours one day, but the next day she might not be able to work at all. She could not predict how she would feel from day to day. (Id. at 62).

Nitsch said she had been taking Wellbutrin for depression for 11 years and it managed her depression satisfactorily. (Id. at 65). She said she felt overwhelmed by her physical symptoms and the medication kept her going from day to day. (Id. at 65). Nitsch said she had been diagnosed with CFS, but there is no objective test to diagnose it. (Id. at 67).

Nitsch said she had not worked for 10 years and she had not looked for work. If her symptoms continued, she did not think she would be able to work in the future. (Id. at 69). She said CFS keeps her from doing what most people consider normal, including taking a shower, cooking a meal, driving, or walking up a flight of stairs. She said each day she has to make choices on whether to take a shower or get dressed. (Id.). On an average, she is unable to get up, shower, dress,

14

or leave the house four to five days a week. (<u>Id</u>. at 70). Three to six times each year she has a three- to four-week stretch where she cannot shower, dress, and leave the house. (<u>Id</u>.). She had allergies and asthma that caused recurrent sinus infections and bronchial problems which also impacted the CFS. (<u>Id</u>. at 71). She said with narcolepsy, she does not go through the normal stages of sleep so she did not know if she would get a full night of restful restorative sleep. (<u>Id</u>. at 73).

Debra Determan, vocational expert, (<u>id</u>. at 79-80) stated that an individual who can do sedentary, unskilled work could not do any of the past work Nitsch had done. (<u>Id</u>. at 82). However, such an individual could work as an order clerk for food and beverage, of which there would be 600 jobs in the four-state area and 26,000 jobs nationally; (<u>id</u>. at 82) change accounts clerk, of which there were 1,200 jobs in the four-state area and 17,000 nationally; or clerical positions such as addresser, of which there were 800 in the four-state area and 17,000 nationally. (<u>Id</u>. at 83). Determan stated that Nitsch could do more than 90 percent of unskilled, sedentary jobs. (<u>Id</u>. at 83). If the number of days per week that Nitsch was unable to groom herself, dress, and leave the house was considered credible, there were no jobs possible for Nitsch. (<u>Id</u>. at 84). Under the restrictions listed by Ortman, no competitive employment would be available. (<u>Id</u>.). A person who had marked limitations in seven out of eight categories measuring concentration, persistence, and pace would likely not be competitively employable. (<u>Id</u>. at 85).

### E. The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be disabled at step three or step five. See <u>id</u>. In this case, the ALJ found that Nitsch is not disabled. (<u>See</u> Tr. at 10-31).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See id. The ALJ found that Nitsch had not engaged in substantial gainful activity since April 24, 2008, the application date. (Tr. at 15). The ALJ noted that Nitsch amended her onset date to 17 months prior to her filing date, which is the earliest date of entitlement and was not based on medical evidence. (Id. at 13). Nitsch had been denied benefits in 2004 and she was not seeking to reopen that decision. In addition, the ALJ noted that Nitsch's earnings record showed that she had acquired sufficient quarters of coverage to remain insured through March 31, 2009, meaning that she needed to establish disability on or before that date in order to be entitled to disability and disability insurance benefits. (Id. at 13).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the

16

claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Nitsch had the following severe physical impairments: obesity, CFS, asthma, migraines, chronic obstructive pulmonary disease; and the following severe mental impairments: depression, anxiety, and a personality disorder. (Tr. at 15). The ALJ found that the impairments significantly limited Nitsch's physical and mental ability to perform basic work-related activities. (Id. at 16). The medical evidence also showed that Nitsch had itchy skin on her forehead and narcolepsy, but there was no evidence that the itchy skin affected her ability to perform basic work-related activities. The narcolepsy had been successfully treated, as was her hypersomnolence, and those impairments did not significantly limit Nitsch's physical or mental ability to do basic work activities, and the ALJ found them to be not severe. (Id.).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be disabled.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a).  The ALJ found that Nitsch did not have an impairment or combination of impairments that met or medically equaled the severity of  one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (Tr. at 16). The ALJ noted that Nitsch's weight and height placed her in the obese category and that the effects of her obesity on her other impairments was considered in determining whether she met or medically equaled a listing. (Id.).

17

Step four requires the ALJ to consider the claimant's RFC[3] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f). In this case, the ALJ found that Nitsch had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) except that she may lift no more than 10 pounds, stand no more than two hours, and can sit at least six hours in an eight-hour workday. She could occasionally perform all postural activities and should avoid concentrated exposure to cold, heat, vibrations, fumes, and hazards. Additionally, Nitsch would be restricted to unskilled routine repetitive work. (Tr. at 18).

The ALJ found that Nitsch's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they indicate that she is unable to work. The credible evidence indicated that Nitsch was capable of full-time competitive work in accordance with the RFC assessment. (Id.).

Step five requires the ALJ to consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. § 404.1520(a)(4)(v),

---

[3]   The assessment of a claimant's residual functional capacity measures the highest level of physical and mental activity the claimant can perform despite his or her limitations. See 20 C.F.R. § 404.1545 and 20 C.F.R. § 416.945. See also Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (residual functional capacity is what the claimant is able to do despite limitations caused by all of the claimant's impairments.).

(g); id. § 416.920(a)(4)(v), (g). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. See 20 C.F.R. § 404.1520(A0(4)(v), (g); id. § 416.920(a)(4)(v), (g). Here, the ALJ determined that, considering Nitsch's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Nitsch can perform. (Tr. at 23). The ALJ noted that the VE testified that given all factors, an individual such as Nitsch would be able to perform the requirements of representative occupations such as order clerk for food and beverage, change account clerk, and clerical addresser. (Id. at 24). The ALJ found that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles. The ALJ found that Nitsch was capable of making a successful adjustment to other work that exists in significant numbers in the national economy and that Nitsch has not been under a disability from April 24, 2008, through the date of the decision. (Id.).

### III.  STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)).  See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011).  "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue,

590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error."  Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law."  Id. (citations omitted).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003). See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.    ANALYSIS

Nitsch does not dispute the ALJ's findings as to the first four steps of the evaluation process. (Pl.'s Brf at 12-13). She admits that she has not engaged in substantial gainful activity since April 24, 2008, she has several severe impairments, none of which either singly or in combination meet or equal any of the listings, and she does not have the capacity to return to her semi-skilled and sedentary job as a telemarketer. (Id. at 13). Nitsch disputes the ALJ's finding that

she could perform a significant number of jobs which are sedentary, unskilled, routine and repetitive. (Id.).

*Support for ALJ's Findings*

Nitsch argues that the ALJ did not support her findings with an accurate analysis of the record as a whole and that she misused the information Nitsch provided on daily activity forms when the ALJ concluded that the activities demonstrated Nitsch had the capacity for full-time work. (Id.). On the forms, Nitsch stated that she cannot have a normal day like other people because of CFS. She can only sit for about 90 minutes, stand for 10 minutes, and walk between five and 20 feet without stopping. She said on her best day she cannot lift more than 10 pounds. (Tr. at 187). However, she indicated that in a typical day she read for a few hours, watched television or movies for a few hours, sat at her computer for a few hours, fed and played with her dogs, and prepared and ate meals. (Id. at 203). If she had extra energy, Nitsch said she did some light chores, and if she had a fair amount of energy, she would leave the house to run errands. Nitsch said she was not able to shower every day because she could not stand for that long. She also did not get dressed every day. Nitsch reported that she had a microwave, a toaster oven, and an electric wok in her living quarters which she used to prepare canned and frozen meals because she did not have a lot of energy. She said she could only dust, vacuum, and clean the bathroom when she felt up to it. She has difficulty doing laundry because the equipment is upstairs. (Id. at 203). She occasionally helped her mother in the garden for 15 to 30 minutes. (Id. at 204).

Nitsch said she was able to drive, but she tried to keep most of her errands within a 15-minute radius of her home. For hobbies, she got movies from Netflix and books from the library. She e-mailed or talked on the phone with friends who lived out of town. During football season, she tried to get together with friends to

21

watch a few of the games. (Id.). She went to a therapist and other doctors. She said she tried to leave the house at least once a week, but sometimes it was once every 10 days or two weeks. (Id.).

In interrogatories, Nitsch stated that she could walk for three to five minutes, stand for five to eight minutes, and sit for 20 to 30 minutes. (Id. at 237). In an eight-hour day, she could stand for 20 minutes, walk for 15 to 20 minutes, and sit for 1½ to 2 hours. (Id.). She was unable to predict her good days so she was unable to schedule any work on a part-time or freelance basis. (Id. at 240). Nitsch said she was not able to exercise regularly, but she took her dogs to the park for a walk when she felt up to it. (Id.).

Based on all the evidence, the ALJ determined that Nitsch had no restrictions in activities of daily living. She was able to care for herself and spent her day reading, watching television, and working on her computer. Nitsch also prepared meals and cleaned, although she did not always clean as often as she would like. Nitsch had explained that her inability to complete her household chores was due to her physical problems rather than her mental ones. (Id. at 16).

The ALJ noted that Nitsch stated one of her primary reasons for an inability to work was the diagnosis of CFS. (Id. at 19). Nitsch stated that her symptoms remained stable, but she also alleged that she was unable to sustain activity for any great length of time. The ALJ found that Nitsch is not inactive. She plays with and cleans up after her two dogs and walks up to a mile. She picks up her nine-year-old niece from school at least once per week. Nitsch attends her niece's school functions, including soccer games, has her stay for overnight visits, and takes her niece to the farmer's market and the zoo. (Id. at 20).

The ALJ also noted that Nitsch spent time purchasing and selling items on eBay. (Id.). She volunteered to serve on her neighborhood association's garage sale

committee, went through her belongings with the intent of selling them at a garage sale, and participated in holding a garage sale. (Id.).  The ALJ stated that Nitsch's level of activity was not consistent with her testimony that she is very tired and unable to sustain activity for any great length of time. (Id.).

The ALJ found that Nitsch had moderate difficulties in social functioning. (Id. at 16). Nitsch's mother stated that Nitsch did not respond well to stress or criticism and reacted with anger, isolation, and yelling. (Id. at 17). Jones-Thurman opined that Nitsch had only a fair ability to deal with work stresses, interact with supervisors, and relate predictably in social situations. Cottam concluded that Nitsch was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. (Id.).

The ALJ determined that Nitsch had mild difficulties with concentration, persistence, or pace. (Id.). Jones-Thurman noted that Nitsch had only a fair ability to maintain attention or concentration, to understand, remember, and carry out complex job instructions, or to understand, remember, and carry out detailed but not complex job instructions. Cottam also concluded that Nitsch was mildly limited in her ability to maintain attention and concentration for extended periods. (Id.).

The ALJ assessed Nitsch's complaints in comparison to treatment records, statements to doctors, daily activities, and other factors. The credibility of the claimant is important in evaluating the subjective complaints of impediments. Johnson v. Apfel, 240 F.3d 1145 (8th Cir. 2001). "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Id., 240 F.3d at 1148.

In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the court noted that "[t]he adjudicator may not disregard a plaintiff's subjective complaints solely

because the objective medical evidence does not fully support them." The court stated that the adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as the claimant's daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. Id.

The ALJ is in the best position to determine the credibility of the testimony and is granted deference in that regard. Johnson v. Apfel, supra. An ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary. Ramirez v. Barnhart, 292 F.3d 576 (8th Cir. 2002).

In this case, the ALJ noted throughout the decision that there was little objective evidence to support Nitsch's claimed limitations. For instance, although Jones-Thurman stated that Nitsch had only a fair ability to maintain attention or concentration, and to understand, remember, and carry out detailed or complex job instructions, Nitsch stated that she could watch television for two to four hours at a time, read for a few hours, and sit at her computer for a few hours. (Tr. at 17). In addition, Nitsch reported that she was capable of shopping, driving, and running errands, which the ALJ determined indicated that Nitsch's impairments did not result in a complete inability to function independently outside the home. (Id. at 18).

The ALJ also pointed out that Nitsch reported that medications helped resolve some of her symptoms, especially those related to migraines and asthma. (Id. at 208, 241, 305, 313, 361, 512, 648). And Nitsch reported that her medication for depression had remained unchanged for 11 years and that it helped resolve

24

some of her mental health issues. (Id. at 54, 65-66). A determination that a claimant's various illnesses were well controlled with medication that is supported by substantial evidence precludes a finding of disability. Perkins v. Astrue, 648 F.3d 892, (8th Cir. 2011). If an impairment can be controlled by treatment or medication, it cannot be considered disabling. Brace v. Astrue, 578 F.3d 882, 885 (8th Cir.2009).

Other inconsistencies can be found in the record. Nitsch told Jones-Thurman that her restrictions in daily activities were due to her physical complaints and alleged pain, and she claimed in interrogatory answers that she was limited to sitting and standing only a few minutes at a time. (Tr. at 237, 433-34). However, Sundell conducted a physical examination and found essentially normal results. (Id. at 306, 644, 647). Other doctors reported that Nitsch's gait and strength were normal. (Id. at 418, 613). Thus, the medical records did not support Nitsch's subjective complaints.

The mental status examinations were also in large part normal. Jones-Thurman reported that Nitsch had a depressed mood, but the psychologist also stated that Nitsch had intact memory and adequate concentration for simple tasks. (Id. at 433-34).

The ALJ also stated that Nitsch's motivation for seeking treatment was suspect. (Id. at 20). Jones-Thurman stated that Nitsch had spent more than one year with the goal of applying for disability. Nitsch expressed concern to Jones-Thurman because Nitsch's mother seemed to believe it was Jones-Thurman's job to make sure Nitsch was approved for disability. (Id. at 537). While Nitsch argues that the statements by Jones-Thurman were intended to illustrate Nitsch's procrastination and inability to complete necessary tasks, it was for the ALJ to weigh the credibility of both Nitsch and Jones-Thurman.

Other inconsistencies in the record support the ALJ's observation that Nitsch's daily activities were not in line with her alleged limitations. Nitsch stated that she could walk her dog for up to one mile when she felt up to it and that she could sit at a computer for several hours per day. (Id. at 21, 203). Jones-Thurman's records include reports of a variety of activities that Nitsch was able to take part in, in contrast to Nitsch's claim that she was unable to leave her living quarters. She reported taking a trip to Minneapolis (id. at 552), driving to a funeral in North Platte, (id. at 627) going to Lake Okoboji for five days, (id. at 710) attending soccer games (id. at 537), selling items online (id. at 600), watching football games with friends and going to a game, (id. at 204, 630) going to the post office (id. at 600), helping with a garage sale (id. at 603), and taking care of her niece. (id. at 203, 205, 563, 553). The record does not suggest that Nitsch's physical or mental condition has deteriorated in the past several years. In McDade v. Astrue, 720 F.3d 994 (8th Cir. 2013), the ALJ found the claimant was not unduly restricted in his daily activities because he had the ability to perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with the use of an electric cart. The appellate court found that the ALJ did not err in discounting the most severe subjective complaints of pain. Id.

Nitsch argues that her ability to do some activities of daily living does not indicate that she could sustain full-time employment. However, the inconsistencies identified by the ALJ are part of the overall credibility assessment, even if the activities do not meet the demands of full-time employment. Participation in daily activities may not dispositively show that a claimant's complaints of pain were exaggerated, but such participation is appropriate for the ALJ to consider under Polaski. Curran-Kicksey v. Barnhart, 315 F.3d 964 (8th Cir. 2003). The United States Court of Appeals for the Eighth Circuit has acknowledged that its cases

26

"admittedly send mixed signals about the significance of a claimant's daily activities in evaluating claims of disabling pain," but it is not unreasonable for the ALJ to rely on evidence of such activities to infer that a claimant's assertions of disabling pain were not entirely credible. <u>Clevenger v. Social Sec. Admin.</u>, 567 F.3d 971, 976 (8th Cir. 2009). I find there is sufficient evidence in the record to support the ALJ's findings.

*Rejection of Treating Physician Opinions*

Nitsch also objects to the ALJ's rejection of the treating source opinions of Jones-Thurman and Ortman. The ALJ determined that Jones-Thurman's opinions should be given little weight because, although she was Nitsch's treating psychologist, her opinions were inconsistent with each other and inconsistent with the record as a whole. (Tr. at 21). In addition, Jones-Thurman's opinion that Nitsch was so markedly impaired in her ability to maintain concentration, persistence, and pace was not supported by Nitsch's own description of her abilities. (<u>Id</u>. at 22).

Jones-Thurman treated Nitsch beginning in October 2008. After a psychological consultative examination in December 2009, Jones-Thurman determined that Nitsch only had restrictions in her ability to adapt to changes in her environment, being out of her routine, and in handling her own funds. (<u>Id</u>. at 21). In June 2010, Jones-Thurman found Nitsch at least moderately impaired in activities of daily living, social functioning, and in concentration, persistence, and pace. Jones-Thurman stated that Nitsch had experienced repeated episodes of decompensation, would decompensate with even a minimal increase in mental demands or change in environment, and would benefit from living in a highly structured and supportive setting, although such a setting would not be required. Jones-Thurman also found that Nitsch had marked impairments in seven of eight

areas showing the ability to maintain concentration, persistence, and pace. She confirmed her opinion in November 2010 and again in May 2011. (Id.).

After reviewing Nitsch's record with respect to mental health issues, Cottam determined that Nitsch was moderately limited in her ability to maintain attention and concentration for extended periods and in her ability to accept instructions and respond appropriately to criticism from supervisors. (Id. at 22). Cottam found Nitsch to have moderate difficulties in maintaining social functioning and to have mild difficulties in maintaining concentration, persistence, and pace. The ALJ gave Cottam's opinion significant weight because it was based on a thorough review of the record as a whole and was consistent with the record as a whole. In addition, Cottam was an examiner with the Disability Determination Services and was familiar with Social Security's rules regarding disability determination. (Id.).

The ALJ gave little weight to Ortman's opinion that Nitsch could sit for two hours at a time and for a total of five hours in an eight-hour day, and stand for less than 15 minutes at a time for a total of one hour in an eight-hour workday. (Id.).

The ALJ gave significant weight to the opinion of Knosp because it was based on a thorough review of the record as a whole and was generally consistent with the record as a whole. In addition, as a DDS examiner, Knosp was familiar with Social Security's rules regarding disability determination. (Id.).

Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding. Anderson v. Astrue, 696 F.3d 790 (8th Cir. 2012), citing 20 C.F.R. § 404.1527(c)(2). "Indeed, when the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight." Id. at 793. "However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or

28

more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. (internal citation omitted). Ultimately, the ALJ must provide sufficient support to explain the weight given the treating physician's opinion. Id., citing 20 C.F.R. § 404.1527(c)(2).

In this case, the ALJ provided support for her decision to give little weight to the opinions of Jones-Thurman and Ortman. Jones-Thurman's opinions were inconsistent with other reports in the record, and Ortman's opinion appeared to be based solely on subjective reports from Nitsch. I must consider both evidence that detracts from the ALJ's decision, as well as evidence that supports it, but I will not reverse simply because some evidence supports a conclusion other than that reached by the ALJ. See McDade v. Astrue, supra.

I find no error in the ALJ's decision to give little weight to the opinions of Jones-Thurman and Ortman. There were inconsistencies in Jones-Thurman's opinions. She stated at one point that Nitsch could take short and simple instructions and could relate to coworkers and supervisors. (Tr. at 434). Opinions given at a later time indicated greater levels of limitation, but Jones-Thurman's treatment notes did not support a decrease in Nitsch's abilities. (Id. at 582-89). "Where a treating physician's opinion is itself inconsistent, it should be accorded less deference." Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).

Jones-Thurman's treatment notes consist mainly of Nitsch's complaints. There is little clinical observation or explanation related to Nitsch's mental health. (Tr. at 536-68, 599-604, 625-30, 667-68, 708-14). Jones-Thurman does not refer to any testing to determine Nitsch's ability to concentrate.

In addition, Jones-Thurman stated that Nitsch had repeated episode of decompensation. (Id. at 588). An "episode of decompensation" is an exacerbation

or temporary increase in symptoms causing loss of adaptive functioning, demonstrated by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4). Such an episode may be inferred from medical records showing significant alteration in medication, or documentation of the need for a more structured psychological support system, such as hospitalization, placement in a halfway house, or other evidence in the record about the existence, severity, and duration of the episode. Id. The record does not indicate that Nitsch ever sought inpatient treatment. And she was on the same dose of depression medication for a number of years. There is no additional support in the record about any restrictions in memory and concentration as suggested by the forms completed by Jones-Thurman. Thus, there is no evidence that Nitsch ever suffered a single episode of decompensation. The ALJ had reason to give little weight to Jones-Thurman's opinion.

The ALJ also gave little weight to Ortman's opinion, finding that it appeared to be based on Nitsch's subjective complaints, and not on objective medical evidence. In addition, Ortman's opinion was inconsistent with the record as a whole. (Tr. at 22). The records provided by Ortman include only a reference to a sleep study, which found that Nitsch had idiopathic hypersomnolence. (Id. at 340). There were no other objective tests conducted to confirm her complaints. Ortman stated that Nitsch could sit for two hours at a time before having to stand or walk for 15 minutes and that she could sit for five hours in an eight-hour workday. (Id. at 22). Nitsch's own descriptions of her daily activities exceeded the limits suggested by Ortman. Ortman's clinical notes appeared to consist mainly of a recounting of Nitsch's complaints. (Id. at 338-39, 506, 580, 654, 671, 718).

30

A treating physician's opinion "does not automatically control in the face of other credible evidence on the record that detracts from that opinion." Brown v. Astrue, 611 F.3d 941, 951 (8th Cir. 2010) (internal citation omitted). In addition, the ALJ may credit other medical evaluations over those of a treating physician when such other assessments are supported by better or more thorough medical evidence. Id. An ALJ should take into consideration the length of the treatment relationship and the frequency of examinations when deciding how much weight to give a treating physician's opinion. Id.

The evidence in the record supports the ALJ's reasons for discounting the opinions of Jones-Thurman and Ortman. The ALJ's opinion was supported by substantial evidence.

*RFC*

Finally, Nitsch argues that the ALJ's RFC assessment was not supported by substantial evidence. The ALJ found that Nitsch had the residual functional capacity to perform sedentary work except that she may lift no more than 10 pounds, stand no more than two hours and can sit at least six hours in an eight-hour workday; can occasionally perform all postural activities, and should avoid concentrated exposure to cold, heat, vibrations, fumes, and hazards. Additionally, Nitsch would be restricted to unskilled routine repetitive work. (Tr. at 18).

The ALJ concluded that the RFC assessment was supported by the record as a whole. Nitsch had essentially normal physical, neurological, and mental status examinations. (Id. at 22). Her conditions were well-controlled by her medications. Her statements regarding the severity of her symptoms were not consistent with the level of treatment that she was receiving and were not consistent with other statements she made regarding her activity level and the efficacy of her medications. (Id.).

31

The ALJ found that Nitsch's ability to perform all or substantially all of the requirements of sedentary work had been impeded by additional limitations. (Id. at 23). To determine the extent to which the limitations eroded the unskilled sedentary occupational base, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual of Nitsch's age, with her education, work experience, and RFC. (Id. at 23). Although the VE stated that an individual with the level of impairment found by Jones-Thurman would not be competitively employable, the ALJ properly gave little weight to Jones-Thurman's opinion, as noted above. The VE determined that Nitsch would be able to perform the requirements of representative occupations such as order clerk for food and beverage, change account clerk, and clerical addresser. (Id. at 24). The ALJ took into consideration the VE's testimony and determined that Nitsch was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Id.). A finding of not disabled was appropriate. I agree with the ALJ's determination.

## V.   CONCLUSION

The ALJ considered Nitsch's age, education, work experience, and RFC, and determined there are jobs that exist in significant numbers in the national economy that Nitsch could perform. (Id. at 24). The ALJ based her decision on the entire medical record, testimony at the hearing, and opinions of experts, and found that Nitsch is not disabled. I find that there is substantial evidence based on the entire record to support the ALJ's factual findings.  Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997). The ALJ's decision, therefore, must be affirmed.

IT IS ORDERED that the Commissioner of Social Security's decision is affirmed.

Dated April 16, 2014.

BY THE COURT

Warren K. Urbom
United States Senior District Judge